No. 2471.

## Jim Reno v. The State.

**Theft—Evidence—Charge of the Court.**—It was not error for the trial court to permit the State, in a theft case, to prove the contemporaneous theft of other property at the time and place of the theft in issue, but it was error to omit in the charge to limit and restrict such proof to its

legitimate purpose, by instructing the jury that they could convict the defendant for the theft of no other property than that alleged in the indictment.

APPEAL from the District Court of McLennan. **Tried below** before the Hon. John N. Henderson, on exchange.

The conviction in this case was for the theft of a horse, the property of J. J. Davis, in McLennan county, Texas, on the ninth day of April, 1887. The penalty assessed against the appellant was a term of five years in the penitentiary.

J. J. Davis was the first witness for the State. He testified that he lived near Bremond, in Robertson county, Texas. Witness took his family to attend a festival at the Polish church in Bremond on the night of April 9, 1887. Witness's daughter Bettie attended under the escort of Mr. Wheeler. She rode a dark bay horse branded ho on the right shoulder, which belonged to the witness. The said horse had a white snip on the nose. Wheeler rode a roan mare. The horses of the party, including those ridden by witness's daughter Bettie, and by Mr. Wheeler, were hitched in the rear of the church, which was about two hundred yards distant from the railroad depot. Some time after the party reached the church, the firing off of anvils, as part of the ceremonies, commenced, and witness went from the church to look after the horses. He found that the bay horse ridden by his daughter, and the roan mare ridden by Mr. Wheeler, were gone. Witness could discover no indications that they had broken loose. He searched for those horses on that night and afterwards, and finally had some postal cards, describing them, circulated throughout the country. About the first part of June, 1887, he heard of his horse in McLennan county, between Waco and Bremond. The witness went to Waco, got an officer, and started to the neighborhood in which he had been told he would find his horse. At a point about two miles out from Waco, towards Bremond, he met a man named Nathan Jones, who was driving witness's bay horse and Wheeler's roan mare to a wagon. Jones was driving along the main road, going towards Waco. Witness asked him where he got the two horses he was driving. He replied that they came to his house hoppled on or about April 23, 1887, and that he took them up and estrayed them before a justice of the peace. The defense objected to the testimony of the witness as to what was said to him by Jones in the conversation. The court sustained the objection. Defense then with-

drew the objection and announced willingness to admit all proof which would throw light upon the transaction. The witness stated that Jones told him that he, Jones, was told by one Shinn that he. Shinn, and the defendant stole the two horses at a Polish festival in the town of Bremond. At this point the defendant objected that this testimony was hearsay, but, the witness stating that it was a part of his conversation with Jones. the court held that, under the defendant's consent to the proof of the conversation with Jones, the evidence was admissible. Witness then stated that he took possession of the bay horse which belonged to him, and of the roan mare which belonged to Wheeler. He found Wheeler's saddle in the neighborhood in which defendant lived, but had never recovered his daughter's side saddle. Witness never saw the defendant in possession of either of the said horses. No person had the consent of the witness to take the horses. The bay horse was taken from witness's possession in Robertson county, Texas, and was recovered by him in McLennan county.

James Wheeler testified, for the State, that he lost his certain unbranded roan mare at the same time and place that Mr. Davis lost his bay horse. Witness escorted Miss Bettie Davis to the festival at the Polish church in Bremond, on the night of April 9, 1887, Miss Bettie riding her father's bay horse branded ho on the shoulder, and witness riding his mare. He hitched the said horse behind the church, escorted Miss Bettie into the church, and soon returned to see that the horses were secure. They were gone when he reached the place where he tied them, and he saw no indication of their having broken loose. Witness searched after and inquired for the horses, but failed to find or hear of them until some ten or fifteen days after they disappeared, when he heard of them in McLennan county. Mr. Davis recovered the witness's horse and saddle for him. No one had the witness's consent to take either of the said horses.

Miss Bettie Davis testified, for the State, that when she dismounted from the horse mentioned in this indictment, at the Polish church, on the night of the alleged theft, she observed a tall and a short man standing together, not far from where Mr. Wheeler hitched the horses ridden by him and herself. Defendant was a tall man.

A. F. Jordan testified, for the State, that he resided in McLennan county, Texas, and knew the defendant and John Shinn. He lived on Shinn's place during the latter part of 1886, and

until June, 1887. On the twelfth day of June, 1887, Shinn told the witness that the defendant wanted to see him. Witness went to defendant's house, about a mile distant, on that evening and found defendant, his brother Lew. and John Shinn together. He found defendant and Shinn in the yard. As witness entered the yard the defendant approached him and said to him: "I am glad you have come over. John Shinn says you are all right, and I guess you are." Witness replied: "I hope I am." Defendant then said: "We have got two wet horses, and we want you to run them off for us; we will give you one of them if you will run them off." Witness asked where the horses were. Defendant replied that they were in his field behind a neighboring hill. He said that one was a bay horse and the other a roan mare; that he and Shinn had to get rid of these two horses; that they took them in Robertson county; that, had he known in time to whom they belonged, he would not have taken them for the world, as they belonged to one of his best friends. He then said that he "forked" the horse, and that Shinn "forked" the mare. Witness declined to take the horses off. Defendant then offered him both animals to run them off, but witness again declined. Shinn then gave witness a saddle, of which he said he would make the witness a present. Witness took it home, but on the next day returned it to Shinn. Defendant told witness that the bay horse stolen by him had on a side saddle, and that he rode the side saddle until he reached a point about three miles from Bremond, when he threw it into a haw thicket because it hurt him. Shortly after his conversation with defendant and Shinn, the witness saw a roan mare in the defendant's field. He walked around that animal and saw that she was unbranded. Defendant had been recently using some horses which belonged to Joe Thomas and a roan mare which belonged to Sam Andrews. The roan mare which witness saw in defendant's field was not the Andrews mare, nor was it one of the Thomas animals. Andrews's mare was branded TBA. Witness examined the mare closely, because Justice of the Peace Palmer had told him to keep a lookout for stolen horses. It was about April 17, 1887, when witness saw the roan mare in the defendant's field.

On his cross examination, the witness testified that he was not in the habit of associating with John Shinn; that he did not like to be seen in company with Shinn, and that when he did go with Shinn it was on the sly; he did not think Shinn the sort of a man to associate with. Witness made complaint against the defen-

ant in June, 1887. His reason for not doing so sooner was that
he first wanted to get the testimony of some other good man to
prove the theft. He had no bad feeling for the defendant until
the day before this trial, when the defendant cursed him and
said that the witness or any other man who would say that he
stole the horses was a d—d liar. Defendant cursed the witness,
in the manner stated, at the dinner table. He cursed and abused
witness so violently that witness had to leave the table. Defend-
ant followed him, abusing him and cursing him, until the witness
had to apply to the court for protection. Witness denied that, at
a certain time and place in the city of Waco, he met one Tom
Oliphant, and offered to pay Oliphant ten dollars in cash and
fifteen dollars at some future time, if said Oliphant would testify
that he saw the defendant in possession of the horse named in
this indictment. He admitted that he invited Oliphant to his
room in a hotel in Waco, but declared that his purpose was to
hire Oliphant, who was known as a hard working boy, for one
of his neighbors. Witness had not had ten dollars in his posses-
sion at any one time during the past year. Defendant, in March
and April, 1887, had in his possession some horses which belonged
to Joe Thomas, one of them being a bay horse branded A B, and
another, a sorrel horse, branded P W. He also had a roan mare
which belonged to Sam Andrews. That mare was branded, and
was not the mare which the witness saw in the defendant's field
on or about April 17, 1887. Witness never saw defendant in
possession of the mare, further than that she was in his field.
He never saw defendant in possession of the horse described in
this indictment. Witness did not know the present whereabouts
of Nathan Jones, who left the country during the past summer.
The bay horse which witness also saw in defendant's field was
branded ho on the shoulder. The bay horse and the roan mare
witness saw in defendant's field were the same animals which
Nathan Jones estrayed.

The State closed.

John Foster was the first witness for the defense. He testified
that he was conductor of a train on the Houston & Texas Cen-
tral Railway in April, 1887, and made the run between Waco and
Bremond on the tenth day of that month, leaving Bremond at
forty-five minutes past three o'clock, a. m. Defendant boarded
witness's train on that morning at Bremond, and arrived with
the train at Waco about daylight. Witness remembered the
date because he had a number of passengers who had gone to

Bremond to attend the horse race which took place near that place on April 9, 1887. On his cross examination the witness said that he thought a man could ride a horse three miles, leaving the given point at eleven o'clock, and walk back to the point whence he started in time to take the train at forty-five minutes past three o'clock, a. m.

M. H. Kellum testified, for the defense, that he attended the horse race which was run at Bremond on April 9, 1887, and saw the defendant among the spectators. He accompained the defendant and other visitors from McLennan county when they returned from the race track to town. After getting supper, the McLennan county visitors, including defendant, witness, Smith Kellum and Ab Vaughan, went to Bennett's saloon and remained there until forty-five minutes past three o'clock to take the train back to Waco. J. H. Bennett and John Hyatt, of Bremond, were also at Bennett's saloon. The party was drinking somewhat, and spent the time waiting for the train by playing billiards. Witness saw the defendant every few minutes from the time he entered the saloon after supper until he left on the morning train. If defendant was absent from the saloon at any time on that night between supper and the departure of the train, witness did not know it. Witness knew that defendant had some of Joe Thomas's horses in his possession early in 1887. He was at witness's house in a wagon drawn by two horses on the Thursday before April 9, 1887. One of those horses was a bay animal branded AB, and the other was a sorrel mare branded PW. That mare was really a sorrel, but some people called her a roan in color. During the said April, but subsequent to the race, the defendant had in his possession a roan mare branded TBA, which belonged to Sam Andrews. As she had a few white hairs mixed with sorrel, she might be called a roan by some people. Witness did not return to Waco with the crowd on the morning of April 10, 1887, but he saw the defendant board the train going from Bremond to Waco. On his cross examination, the witness said that he did not see defendant continuously from the time he entered Bennett's saloon, after supper on the night of April 9, until he left on the early morning train, but he saw him off and on at intervals of a few minutes.

John Hyatt testified, for the defense, that he lived in Bremond, Texas, in April, 1887, and was one of the parties interested in the horse race that was run near that town on the ninth day of that month. The witness attended that race and saw

the defendant there. Defendant started the witness's horse in the race. After the race, a party, including both the witness and the defendant, went to town, and after supper went to J. H. Bennett's saloon. Witness saw the defendant at Bennett's saloon from a few minutes after supper until the train started to Waco early on the next morning. Witness went to the train with defendant, bought his ticket for him, and saw him get on the train to go to Waco. Witness saw defendant at intervals throughout the said night until the morning train left. Defendant spent much of his time during the night playing at faro, losing money and borrowing from witness.

Smith Kellum, testifying for the defense, located the defendant in Bennett's saloon in the town of Bremond from about supper time until the train left Bremond for Waco in the morning, when he went to Waco on the said train. Witness saw him at frequent intervals during the night, and knew that he did not leave the saloon until he went to the depot, to board the train. Witness did not see the defendant play at faro, nor did he see a faro game exhibited at that saloon. Ab. Vaughan testified, for the defense, that he was with defendant at Bennett's saloon from supper time on the night of April 9, 1887, until the train left for Waco early on the next morning, and knew that defendant did not leave the saloon until he went to the depot at half past three o'clock, on the next morning. He did not see the defendant play at faro on that night. Bennett, the proprietor of the saloon, testified, for the defense, substantially as did the witness Vaughan, except that he saw defendant during the night, in the back room of the saloon playing at faro.

A. C. Banks testified, for the defense, that he lived in East Waco, McLennan county. Defendant came to the witness's house on the morning of April 9, 1887, riding Joe Thomas's bay horse. He left the horse at witness's house and went off, saying that he was going to Bremond to attend a horse race. He returned on the next morning on the north bound train, took breakfast with witness, and then left, riding Joe Thomas's horse, saying that he was going home.

John Hardwick testified, for the defense, that he saw the defendant on the Joe Thomas bay horse, riding out of Waco early on the morning of April 10, 1887.

Tom Oliphant testified, for the defense, that he knew the State's witness, A. F. Jordan. He met Jordan on the streets of Waco a few days before this trial. Jordan invited witness to go

with him to his room in the Fleshman Hotel. Witness went with him, and on reaching the room Jordan exhibited ten dollars to witness, and said that if he, witness, would swear on this trial that he saw defendant in possession of Davis's horse, he would give the ten dollars to the witness and get him fifteen dollars more. Witness replied that he had never seen the defendant in possession of the Davis horse, and could not so swear.

Cross examined, the witness said that he came to town with Mr. Bosseau on the day that Jordan offered to bribe him to swear against defendant. He did not tell Bosseau about the interview with Jordan, nor did he tell defendant, but did tell John Crowson. He was subpœnaed as a defense witness on the same day. Witness's board at Fleshman's hotel during his attendance upon this trial was to be paid by the defendant. When witness first went to Fleshman's he told Fleshman he had no money, and arranged to board with him on credit.

Joe Thomas testified, for the defense, that in February or March, 1887, he loaned defendant a bay horse branded AB, and also a sorrel mare and a gray horse. He loaned those animals to defendant to work. Early in April Sam Andrews loaned the defendant a roan mare branded TBA.

Lon Reno, the brother of the defendant, testified, in his behalf, that defendant borrowed the three horses described by the witness Thomas, from the said Thomas, in February or March, 1887, and the TBA roan mare early in April, 1887. Witness saw the horses claimed by Davis and taken by him from Nathan Jones. He saw those horses in the possession of the said Jones, but never saw them in the possession of the defendant. Nathan Jones left the country some time in the summer of 1887, and witness had never seen him since. On his cross examination the witness admitted that he was arrested with the defendant, and was charged with this same offense, but was soon discharged. When he was arrested he did say that he was going to stand on his own bottom, and that defendant must look out for himself.

Tom McCool testified, for the defense, that he kept an eating house in East Waco. He saw the defendant get off the train from Bremond on the morning of April 10, 1887.

The defense closed.

Mr. Fleshman testified, for the State, in rebuttal, that defendant came to him a day or two before this trial and arranged to board his witnesses. Witness was not acquainted with Tom Oliphant except by sight. Tom Oliphant was not boarding at

. witness's house unless he was one of the witnesses included within the defendant's contract with witness. Witness never had a conversation with Tom Oliphant about boarding with him on credit.

B. C. Carroll testified, for the State, that Tom Oliphant's repu-' tation for truth and veracity in the community in which he lived was bad. Witness had heard John Graves, now deceased speak of Oliphant's reputation for truth as bad. He had heard John Shinn, now a fugitive from justice under a charge of horse theft, say that Tom Oliphant would not do to rely upon. He knew Nathan Jones, who left the country the summer of 1887.

The State next introduced in evidence the papers and documents relating to the estrayal of the alleged stolen horses, by Nathan B. Jones.

The motion for new trial raised the question discussed in the opinion.

*Clark, Dyer & Bolinger*, for the appellant.

*W. L. Davidson*, Assistant Attorney General, for the State.

Willson, Judge. It appears in evidence that at the same time and place of the theft of the horse named in the indictment, another horse, together with a saddle, was stolen, and the evidence which connects the defendant with the theft of the horse named in the indictment connects him also with the theft of said other horse and with the saddle.

While this evidence of the theft of said other horse and the saddle was competent, and was not objected to by the defendant, still it was incumbent upon the court, in its charge to the jury, to explain the purposes for which such testimony was admitted, and to instruct and direct the jury that it could only . be considered for those purposes, and that the defendant could not be convicted under this indictment for any other theft than the theft of the horse named in the indictment. Such a charge constituted a part of the law of the case, and the failure to give it is fundamental error. (Mayfield v. The State, 23 Texas Ct. App., 645; Wheeler v. The State, 23 Texas Ct. App., 598; Davis v. The State, 23 Texas Ct. App., 210; Kelly v. The State, 18 Texas Ct. App., 262.) The Assistant Attorney General in his brief confesses this error in the charge, and because of such error, the judgment must be reversed and the cause remanded.

We deem it unnecessary to discuss and determine the errors complained of in the brief of counsel for defendant, as they are of a character not likely to arise on another trial. The judgment is reversed and the cause is remanded.

*Reversed and remanded.*